IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **TKC COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. __________** |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **SERVE:** Michael B. Mukasey | ) | |
| U.S. Attorney General | ) | |
| U.S. Department of Justice | ) | |
| Office of the U.S. Attorney General | ) | |
| 950 Pennsylvania Avenue, N.W. | ) | |
| Washington, DC 20530-0001 | ) | |
| | ) | |
| **Defendant.** | ) | |

# EXHIBIT E

# TO COMPLAINT

**On Behalf of Plaintiff TKC COMMUNICATIONS, LLC**

TKC Communications

Claim to the Contracting Officer

Mr. Jehad Salameh
FBMS Contract Administrator
GovWorks Procurement Center
381 Elden Street
Herndon, VA. 20170

Dear Mr. Salameh:

## I. INTRODUCTION

By this letter, pursuant to 41 U.S.C. § 605(a) and FAR 33.206, TKC Communications, LLC ("TKC") files a claim in the amount of $13,547,786.30 based on Master Contract No. 1435-04-04-CT-73132, executed December 11, 2003, and Task Order No. INM0404CT73132/0405DO44761, dated September 15, 2005, as modified October 1, 2005.[1] The United States has breached the contract and is liable for the amount of the claim.

## II. STATEMENT OF FACTS

On December 11, 2003, TKC contracted with the United States through the Department of the Interior Minerals Management Service ("DOI") to provide goods and services under Master Contract No. 1435-04-04-CT-73132("the Contract") in accordance with a Statement of Work ("SW") incorporated into the Contract. The Contract is "a fixed-price construction/services and time and material labor hour, indefinite quantity, indefinite delivery order contract," (Contract II.B.1 p. 2), and provides: "The term of this contract is sixty (60) months from the date of award or until the aggregate total of all Delivery Orders issued against this contract equals the maximum dollar threshold cited above, whichever shall come first." (Contract II.B.3 p. 2). The Contract is a Section 8(a) set-aside for an Alaskan Native Corporation. GovWorks was authorized to issue task orders and to administer the Contract on behalf of DOI.

1.1. On September 15, 2005, GovWorks issued an Order for Supplies or Services No. 0405DO44761 ("Task Order") against the Contract. The Task Order states that it is a FFP [Firm-Fixed-Price] Lease to Ownership Order for the hardware and software in support of the DOI EMS Project in accordance with the SOO [Statement of Objectives] dated 10/8/04.[2] The objective of the Task order was to promote a fully connected, virtual organization by providing its users with a rich set of tools and services supporting

---

[1] TKC is undertaking commercially reasonable methods to liquidate the equipment that is the subject of the contract in mitigation of its damages. Once the equipment has been liquidated, TKC will credit the amount of the claim with the net amount received from the liquidation of the equipment.

[2] The SOO was dated almost a month later than the Task Order.



56198.000062 NORFOLK 99786v1

Exhibit E - 01

TKC Communications

secure any-time, any-place collaboration. DOI expected to achieve management, economic, and functional goals and outcomes consistent with the DOI IT Strategic Plan[3], Enterprise Architecture efforts[4], and Capital Planning and Investment Control (CPIC) guidelines, in support of the President's Management Agenda goals. Specific Departmental objectives to be achieved as a result of the Task Order were:

1. Economic Efficiency
2. Secure Messaging Environment
3. Improvement in E-mail Service
4. Breakdown of Barriers to Collaboration

The terms in the Task Order mirror those in TKC's "Proposal to Provide Three-Year Hardware, Software, and Lease to the Department of the Interior" submitted September 15, 2005. DOI represented that it needed the hardware and software for an enterprise-wide email system within DOI (hereafter the "EMS Project")

At the time the Task Order was issued, DOI used (and continues to use) a LotusNotes email servicing system. DOI explicitly demanded that the EMS Project use Microsoft applications. The SOO states the following:

**"PURPOSE**

**The Department of Interior (DOI) is seeking proposals for contract services to support a DOI managed, Microsoft Exchange based electronic messaging service (referred to herein as DOI Enterprise Messaging Services, or EMS).**

**The desired result is a consolidated departmental messaging service, based on Microsoft (MS) Exchange, operated within a DOI enterprise management and operations control structure, conforming to enterprise architecture and strategic plan goals, and supported through contracted services to be acquired through this Solicitation."**

---

[3] "Department of the Interior Information Technology Strategic Plan, FY2002-2008".

[4] "US Department of the Interior Enterprise Architecture, Technical Reference Model". US Department of the Interior, Interior Enterprise Architecture Conceptual Migration and Implementation Plan".

TKC Communications

The Task Order, as modified, establishes a base period from September 15, 2005 through September 30, 2005 and three 12-month option periods commencing October 1, 2005. It further provides:

> STATEMENT OF GOVERNMENT INTENT:
>
> (a) The Government and the Contractor understand that a delivery order issued is a lease arrangement and contemplates the use of the product for the term of the lease specified in such delivery order (the "Lease Term"). In that regard, the Ordering Agency, as lessee, understands that the lease arrangement contained herein and the rate established for the delivery order are premised on the Ordering Agency's intent to fulfill that agreement, including acquiring products for the period of time specified in the order. [. . . .]
>
> (b) Each ordering office placing a delivery order under the terms of this option intends to exercise each renewal option and to extend the lease until completion of the Lease term so long as the need of the ordering office for the product or functionally similar product continues to exist and funds are appropriated.

(Task Order 2, p. 9).

In addition to these representations of DOI's intent, on October 1, 2005, Matthew H. Steward of DOI issued an "essential use questionnaire" that set out DOI's intent in detail. A copy of this questionnaire is attached as Exhibit A. DOI made the following representations, among others, in the questionnaire.

- What is the product being financed? How does the product enable the users to perform this essential function? Please be specific.

  Hardware and software to accomplish the email migration project. The HW/SW will be set up and the bureaus legacy mail environments will be converted to Exchange 2003. Once converted the end-users will be using Exchange 2003 to send and receive email.

- What is the agency's alternative to using this product; can the tasks that the product performs be performed in another way?

  The only other alternative would be to keep the legacy environments going, but the risk of email failure with these legacy environments is very high with a severe impact to the Department's mission and ability to conduct business.

TKC Communications

- Do the users plan to use this product for the full term of the lease?

  Yes.

- Is there any reason the product would no longer be needed during the entire lease term?

  No.

- To the best of his/her knowledge, does the government intend to appropriate funds in its next budget for the continuation of lease payments?

  Yes.

- What is the Government's current plan with regard to the option years of the lease?

  The current plan is to have the individual bureaus and offices support the migration project. As they decommission their legacy environments, cost savings will be reaped to support the new environment. There is an operations and support component for the new system; however, it is not related to this lease. The lease is only for the hardware and software used to build the new messaging environment.

See Exhibit A. DOI made these representations in order to induce TKC to perform under the Task Order, and TKC did so perform.

On October 1, 2005, GovWorks issued a modification to the Task Order ("Mod 1"). Mod 1 exercised Option Period 1 and provided for the payments due for the option period. The terms block-quoted above of the Task Order were restated in their entirety in Mod 1. In reliance on DOI's affirmative statements, TKC obtained and provided the equipment necessary to perform the Task Order. The cost of this equipment under Mod 1 was $15,417,088. The lease price for the equipment under Mod 1 was $17,547,786.30. DOI paid the $4,000,000.00 price for Option Period 1. The balance of $13,547,786.30 remains unpaid.

In December 2005, DOI completed its preassessment of the equipment necessary to perform the Task Order. DOI had no objection to TKC's ability to perform, although the CIO did question whether the Task Order covered the entire scope of what was needed by DOI. TKC led a series of three "town hall" meetings to discuss implementation of the enterprise-wide EMS. Between December 2005 and late spring 2006, DOI assigned three different project teams to this Task Order. With each new team, TKC had to repeat work previously accomplished as DOI failed to ensure any continuity within the teams or turnover of information.

TKC Communications

In February 2006, TKC representatives met with DOI. DOI unilaterally changed the scope of the work from that contained in the Statement of Objectives dated October 8, 2005. There were a number of significant changes the major items are listed below: There were a number of significant changes the major items are listed below:

1. Requirement for supporting workstations including Mac OS 9.x or higher, Sun Solaris, HPUX, IBM AIX and Linux workstations through the native client **and** web browser interface.
2. Proposed quota is 250 MB for general users with quota threshold warning at 200 MB. (When users reach the 250 MB mail file size, email is archived to the archive servers maintained by the EMS system)
3. Allow for Email Archiving - Contractor shall provide unlimited, automatic archiving and archive view of email to the email content management system for all users. All users shall be able to view and delete messages from the archive and archive view.
4. The system shall prompt the sender before sending messages with large attachments as to whether they wish to continue with attaching the file(s) or reference the file through a URL or other shared file capability.
5. If the user wishes to continue with a large file(s) the system shall prompt the user to provide a charge code for chargeback.
6. The system shall provide a report of the file sizes and potential chargeback amounts.
7. The system shall provide the capability to identify the type of email and specify a NARA records schedule.

Following a second meeting in March 2006, DOI's Chief Information Officer ("CIO") stated that DOI's unilateral changes to the scope might not have funding. In April 2006, the National Business Center approached TKC and DOI's CIO regarding the possible reuse of the leased equipment for a separate project, but the CIO objected on the grounds that the agencies within DOI would not be able to arrive at a consensus on this project. As shown on Exhibit B, the leased equipment could have been reutilized by DOI in any number of ways.

At the request of the CIO, a third meeting followed in June 2006. At this meeting DOI repudiated further performance under the Task Order. It sought to give TKC all of the equipment back. Contradictorily, DOI also assured TKC that it was meeting with its agencies to finalize equipment requirements. After each meeting, TKC addressed the concerns enunciated by DOI to DOI's satisfaction. On August 23, 2006, DOI sent TKC a Request for Proposal that included the additional requirements unilaterally imposed by DOI beginning in March. TKC responded to the RFP on time despite DOI's unreasonable deadline.

On September 29, 2006, DOI through GovWorks informed TKC that it would not exercise Option Period 2. By the terms of the Task Order, DOI was obligated to pay TKC $6,000,000, for Option Period 2. DOI has offered no basis to support any conclusion that it does not have sufficient appropriated funds for the Option Period 2 or that it does not have a continuing need for the equipment or functionally similar equipment. In fact, the agencies within DOI are continuing to work on interconnected email systems that use functionally similar equipment.

TKC Communications

## III. ANALYSIS

DOI was without discretion under the contract and the circumstances that existed to refuse to exercise the option periods. Accordingly, it was obligated to exercise those option periods. Furthermore, DOI is equitably estopped from refusing to exercise the option periods. As a result, DOI is liable to TKC for breach of contract damages.

### A. DOI IS IN BREACH OF THE CONTRACT

#### 1. DOI Restricted Its Right Not to Exercise the Option Periods By Agreeing that It Would Exercise Each Option Period (a) So Long As It had a Need for the Equipment or Functionally Similar Equipment, and (b) Funds were Appropriated.

It is well established that the government can, by contract, restrict its discretion not to exercise an option to renew a lease. See Municipal Leasing Corp. v. U.S., 1 Cl. Ct. 771 (1983); Northrop Grumman Computing Systems, Inc. v. GSA, GSBCA No. 16367, June 2006; and Planning Research Corp. v. Department of Commerce, GSBCA 11286-COM, 96-1 BCA 27954 (1995). DOI has done so here. DOI's discretion whether to exercise the option periods is significantly circumscribed by the language of Task Order. DOI agreed to exercise the option periods "so long as the need of the ordering office for the product or functionally similar product continues to exist and funds are appropriated." (Task Order 2.(b) p. 9).

#### 2. DOI Failed to Exercise the Option Periods.

DOI refused to exercise Option Period 2. See page 4, infra. The equipment has been returned by DOI and is in the possession of TKC. DOI had no right not to exercise the option periods, since funds were appropriated and a need continues to exist for the equipment ordered or functionally similar equipment.

#### 3. Funds Were Appropriated.

Notwithstanding the contracting officer's statement that the government would not exercise the option effective October 1, 2006, due, in part, to a lack of funds, sufficient funds were appropriated for DOI to pay for the option period commencing October 1, 2006.

The Contract was issued by the DOI's Mineral Management Service. DOI's GovWorks issued the Task Order. GovWorks, also known as the DOI Franchise Fund, operates under the Federal Franchise Fund Authority of Section 403 of the Government Management Reform Act of 1994 and provides acquisition services to DOI and other federal agencies. *See* http://www.govworks.gov/. Under a revolving fund such as the DOI Franchise Fund (GovWorks), the customer organization must apply the time rules that apply to its own appropriations. The customer agency obligates an appropriation within its specified period of availability and for a bona fide need attributable to that period. *See* Principles of Federal Appropriation Law, Second Edition, Volume IV, March 2001, Chapter 15, Part C, 4.c.

In this case, the customer agency is DOI. Funds are appropriated to DOI on an annual basis. *See, for example,* Public Law 109-54, August 2, 2005, "An Act Making appropriations for

TKC Communications

the Department of the Interior, Environment, and related agencies for the fiscal year ending September 30, 2006, and for other purposes." Under Public Law 109-54, DOI was appropriated over $16 billion dollars (almost $11 billion in current authority and over $5 billion in permanent authority). Generally, those appropriations are made to DOI's various bureaus and are available for varying periods of time, including for periods of one, two, and three years, and in some cases until expended. DOI has provided no evidence that those appropriations are not sufficient to cover the $6,000,000 due TKC for the option period beginning October 1, 2006.

Even if DOI did not have sufficient funds appropriated by Public Law 109-54, or prior year appropriations acts, to fund the option period beginning October 1, 2006, it surely had such appropriations on October 1, 2006, by virtue of the continuing resolution for fiscal year 2007. *See* Public Law 109-289, Division B, Continuing Appropriations Resolution, 2007, September 29, 2006. Under Division B of Public Law 109-289, DOI and other federal agencies were appropriated "Such amounts as may be necessary under the authority and conditions provided in the applicable appropriations Act for fiscal year 2006 for continuing projects or activities ... that are not otherwise specifically provided for in this division, and for which appropriations, funds, or other authority would be available in [that agency's fiscal year 2007 appropriation act]".

Sufficient funds were appropriated to DOI, both by virtue of DOI's fiscal year 2006 appropriation act and by the continuing appropriations resolution for fiscal year 2007. In fact, there is no restrictive language in either the DOI fiscal year 2006 appropriation act or in the continuing appropriations resolution for fiscal year 2007 that would prevent DOI from using appropriated funds to pay for Option Period 2, effective October 1, 2006. The Supreme Court recently reaffirmed that:

> "a fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency." *Lincoln v. Vigil,* 508 U.S. 182, 192[, 113 S.Ct. 2024, 124 L.Ed.2d 101] (1993) (internal quotation marks omitted).
>
> Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631, 637; 125 S.Ct 1172, 1177 (2005).

In Cherokee Nation, the DOI appropriations contained no relevant statutory restrictions, and the Court held that where the amount of the lump sum appropriations exceeded the amount due under the contracts, the government could not avoid its contractual obligation to pay on grounds of insufficient appropriations. 543 U.S. at 631; 125 S.Ct at 1174. A contractor is entitled to payment, even if the agency has allocated funds to another purpose. 543 U.S. at 632; 125 S.Ct at 1174.

DOI clearly had authority under its continuing resolution to obligate funds to continue projects and activities existing in 2006. DOI simply indicated, in a debrief of its decision in



56198.000062 NORFOLK 99786v1

October 2006, that its failure to exercise the option was not based on a lack of appropriations, but on different priorities. In this case, a change of priorities does not relieve DOI of its contractual obligation to exercise the option as long as funds are appropriated and the requisite need continues to exist. See also Municipal Leasing Corp. v. U.S., 7 Ct.Cl. 43 (1984) (Air Force did not use its best efforts to obtain appropriated funds) and Northrop Grumman Computing Systems, Inc., supra (Air Force decided to give other projects a higher priority).

**4. DOI Continues to Have a Need for the Equipment or Functionally Similar Equipment.**

**a. "Functionally Similar Equipment" Means Equipment that Performs the Same or Substantially Similar Functions.**

DOI continues to have a need for a "functionally similar product."[5] DOI and its agencies continue to use a functionally similar email software application, LotusNotes, and to develop an interconnected email system among some or all of its subordinate agencies using functionally similar equipment.

**i. Taken together, TKC's equipment and DOI's legacy equipment are "functionally similar."**

The LotusNotes system now being used by DOI is functionally similar to, though less advanced and capable than, the hardware and software comprising the EMS Project. The EMS Project and LotusNotes email messaging systems contain the following similar functions:

- Both systems send, receive, store, retrieve, and search email messages and attachments;
- Both systems contain similar features including interface; messaging, collaboration, calendar, address book and global address book;
- Both systems offer features permitting meeting management, contact management, task management, security and content management, performance optimizing, and client services features.

In short, the legacy e-mail system currently being used by DOI use equipment that is "functionally similar" to the equipment that was the subject of the Task Order. No reasonable

[5] "Functionally similar product" has its plain meaning, i.e., a product that is able or designed to perform an operation or role that resembles but is not identical to that of TKC's product. Webster's II New Riverside Dict., pp. 281-2, 632 (rev. ed. 1996); see Transwestern Pipeline Co. v. United States, 939 F.2d 679, 683 (Ct. Cl. 1980) (holding "line pack gas" in a transmission pipeline and "cushion gas" in an underground storage reservoir were "functionally similar" as each performed similar functions and had similar characteristics).

TKC Communications

person could compare the capabilities of both systems and come to any other conclusion. TKC would never have accepted the Task Order if DOI possessed the unilateral right to refuse to exercise the option periods and continue to use its legacy e-mail system. That was the entire purpose of inserting into the Task Order the "need for ... functionally similar equipment" language referenced above. It would make no sense for TKC to enter into a Task Order -with unpaid option periods of over $13 million dollars, if DOI could simply change its mind on a whim and continue to use its legacy system, leaving TKC in a $13 million dollar lurch.

**ii. Taken Individually, TKC's Equipment Could Have Provided Computer Capability, such as Storage, Firewall, etc.**

The hardware and software purchased by TKC for this project had other uses besides e-mail. DOI could have chosen to reutilize this equipment in any number of ways, as more particularly set out in Exhibit B. DOI did not explore any of these alternative uses. Indeed, most of the equipment purchased by TKC and delivered to DOI was never even taken out of the box. Therefore, whether used individually or collectively, TKC's equipment is "functionally similar" to DOI's legacy equipment.

**b. DOI "Needs" TKC's Equipment or its Own, Functionally Similar, Legacy Equipment.**

**i. DOI Continues to Need E-mail System Services Generally.**

DOI's continuing "need" for an e-mail system is obvious. The essential use questionnaire stated that loss of e-mail service would result in "a severe impact to [DOI's] mission and ability to conduct business." DOI continues to use e-mail through its legacy system. While that system is not as capable as the system which TKC's equipment would have provided, it is still being used by DOI personnel. This continued use by DOI demonstrates — obviously — a continued need for e-mail service. If DOI did not need e-mail, it would not be using it. In this day and age, no business or government entity can operate without e-mail service. DOI's need for a computer system that provides e-mail service is beyond dispute.

**ii. DOI Continues to Need and Use Functionally Similar Equipment to Provide and Maintain E-mail System Services for its Existing Lotus-Based E-mail system.**

It has been previously demonstrated that TKC's equipment is functionally similar, though more advanced than, DOI's legacy system. Obviously, the two systems are not identical. But the government has already agreed in the Task Order that the systems need not be identical. In fact, the government has agreed that the systems need not even be similar. "Similar" is modified in the Task Order's language by the word "functionally." DOI was <u>required</u> to exercise option period 2 if TKC's equipment performed similar (not identical) functions to its own legacy equipment and had similar (not identical) characteristics to its equipment. <u>Transwestern Pipeline, supra</u>.

If DOI had wanted to enlarge its discretion to encompass its actions here, it could have done so. Instead of promising to exercise future options if it needed "functionally similar"

TKC Communications

equipment, DOI could have promised in the Task Order to exercise future options only if it needed TKC's equipment or other, identical equipment. But that is not what DOI said. Had DOI written the Task Order in that fashion, TKC would have understood DOI's true intent. Such language would have resulted in a completely different Task Order — or perhaps no Task Order at all. DOI cannot be permitted to write a vague Task Order and then hide behind a veil of ambiguity. DOI's actions speak far louder than its words. It "needs" e-mail service and continues to have a need for functionally similar equipment for that e-mail service. Given that need, DOI was without discretion to decline Option Period 2. Doing so was wrong and violated its contract with TKC.

**iii. DOI Continues to Need and Use Functionally Similar Equipment to Provide Capabilities Other Than E-mail Offered by the Equipment.**

As has been shown on Exhibit B, TKC's equipment could have filled other needs for DOI. BMC software, legato software, Symantec software and Engenera blade servers could all be used to supplement DOI's current computer needs. Put another way, TKC's equipment is functionally similar to much of the equipment and software currently being used by DOI. DOI did not even try to determine whether it could use this equipment. DOI's use of functionally similar equipment for purposes other than e-mail demonstrates that DOI had a need for the ordered equipment and that DOI's failure to renew the lease puts it in breach of its contract with TKC.

**c. Case Law Demonstrating that DOI is in Breach of Contract.**

This case is indistinguishable from Municipal Leasing Corp. v. United States. The Air Force contracted for a lease to ownership of 10 computer terminals with a base period of two months and two subsequent option periods, each of one year. The contract specified as required by the Anti-Deficiency Act that funds were not presently available for the option years, but additionally provided that "The Air Force shall not replace the leased equipment with functionally similar equipment during the term of the contract." Id. at 772. The Air Force sent a notice of intent to renew in July 1981, but in September informed the contractor that the option would not be renewed due to lack of funds. In a letter denying the contractor's subsequent claim, the contracting officer stated that the Air Force had used best efforts to secure funding but funds were not appropriated, and the Air Force had not "replace[d] the equipment with functionally similar equipment during the term of the contract." Id. at 773. The court denied the government's motion for summary judgment.

In subsequent proceedings, the Air Force conceded that it had not used best efforts to obtain funds as required by the contract, but that it could nevertheless terminate the contract for convenience. Municipal Leasing Corp. v. United States, 7 Cl.Ct. 43, 46 (1984). The terminals leased under the contract had been selected by the Air Force as a replacement for existing hardware, Hazeltines. The Air Force contracted for the new terminals because the manufacturer of replacement program chips for the Hazeltines required a minimum purchase of 250 chips but the Air Force only needed 20. The evidence demonstrated that the Air Force, during the term of the contract with Municipal, decided to purchase replacement parts for the Hazeltines, and for that reason did not exercise the option for the Municipal terminals. "The termination for

TKC Communications

convenience clause can appropriately be invoked only in the event of some kind of change from the circumstances of the bargain or in the expectations of the parties." Id. at 47 (citing Municipal Leasing Corp. v. United States, 1 Cl.Ct. 771 (1983); Torncello v. United States, 681 F.2d 756 (Ct.Cl. 1982)). By repairing the Hazeltines, the Air Force breached its contractual promise that it would not replace the Municipal terminals with functionally equivalent equipment. "The termination for convenience clause will not act as a constructive shield to protect defendant from the consequences of its decision to follow an option considered but rejected before contracting with plaintiff." Id. (citing Torncello). The court awarded summary judgment to the contractor on liability.

TKC has met its burden to demonstrate DOI's breach. Funds were appropriated. TKC's equipment is functionally similar to equipment that DOI is using for its legacy e-mail system and for other purposes. DOI has a need for the ordered equipment or for functionally similar equipment to support its legacy e-mail system or for use in other purposes. DOI had appropriated funds to pay for the next Option Period. TKC has clearly demonstrated DOI's breach of contract. Were this the end of the matter, TKC would be entitled to have its entire claim approved. But there is more.

**B. DOI MISREPRESENTED ITS INTENT TO ENTER A LEASE TO PURCHASE.**

**1. Misrepresentations Relied Upon by A Contractor Which Result in Damages Are Recoverable Against DOI.**

As stated in T. Brown Constructors, Inc. v. Pena, 132 F.3d 724, 728-729 (Fed.Cir. 1997), "A contractor can recover damages under a contract for a misrepresentation by the Government in the contract documents, [citations omitted]. In order for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment. [citations omitted]."

**2. DOI Represented It Would Use the Equipment for the Full Lease Term.**

This point has already been made. The Task Order's language in the "Statement of Government Intent" and the further representations made in the "essential use questionnaire" indicated to TKC that DOI intended to use the equipment for the full lease term and to pay TKC the full lease price negotiated by the parties.

**3. TKC Obtained and Provided Equipment in Reliance on DOI Representations.**

DOI entered into the Task Order, obtained and provided the equipment to DOI believing that DOI fully intended to use and pay for the equipment for the full term of the lease.

**4. TKC Provided Favorable Pricing in Reliance on DOI Representations.**

TKC Communications

The Task Order pricing arrangement was established based on DOI's stated intent to fulfill the agreement and acquire the products. TKC offered, and DOI readily accepted favorable prices that TKC would not have offered if TKC could merely not renew the lease because it wanted to pursue other priorities. Had TKC known that DOI would only pay for the full lease term if it had no other priorities for its appropriated funds, TKC would not have given such favorable pricing in the first year, or extended the pricing on such favorable terms for the balance of the lease.

**5. Because DOI Had No Intent to Use TKC's Equipment, it is in Breach of its Contract.**

DOI's representations that it intended to use the equipment for the full lease term are belied by DOI's conduct. Almost from the very beginning, DOI personnel sought to avoid performing under the Task Order. It assigned "musical chair" project teams to delay project implementation. It dramatically increased the scope of the project with no increase in TKC's compensation. It repudiated performance under the contract. It refused to consider reuse of the equipment. TKC believes DOI had no intent to perform under this Task Order from the very beginning. Not only do the documents contain a misrepresentation that the lease would be for several years and a lease to purchase, DOI reinforced that misrepresentation through the "essential use questionnaire." "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Restatement (Second) of Contracts § 162 (1979); T. Brown Constructors, Inc. at 729. Clearly, these representations were made in order to induce TKC to obtain and provide the equipment at favorable pricing terms under the Task Order.

DOI misled TKC regarding its intent to enter into a lease to purchase contract and therefore is likewise in breach of contract. Cf. Pacificorp Capital, Inc. v. United States, 15 Cl.Ct. 663, 666 (1988) (holding the government would have violated the contract provision that provides: "Any FLTOP is executed by the Government on the basis that the known requirements exceed the initial term which parties agree is twelve (12) months or the remainder of the fiscal year" if it entered into the contract without such intent).

**C. DOI IS EQUITABLY ESTOPPED FROM REFUSING TO EXERCISE THE OPTION PERIODS.**

**1. The Government's Discretion Can Be Limited by Equitable Estoppel When a Contractor Relies on Government Representations to its Detriment.**

The government's discretion to exercise an option can be limited by equitable estoppel arising from pre-award conduct. In Manloading & Mgmt Assocs., Inc. v. United States, 461 F.2d 1299 (Ct. Cl. 1972), the government awarded a contract for the conversion of 3,000,000 FHA mortgage records to a magnetic tape storage and retrieval system. The invitation for bids specified that "The Government anticipates that the work to be performed under this contract cannot be completed until Fiscal Year 1972. However because of fiscal year limitations on funds, the contract to be awarded under this solicitation covers work to be performed through

TKC Communications

June 30, 1970." Id. at 1300. The contract also gave the government the option to renew the contract. Id. At a pre-award bidders' conference in April 1970, the contracting officer's representative assured bidders that this language "was intended to afford the Government an option to terminate the agreement at the conclusion of any fiscal year . . . in the event that funds were not appropriated to permit completion of the contract, but that any prospective bidder should be assured that funds were available and that there would be no question about the renewal of the contract for the fiscal year beginning July 1, 1970." Id. at 1301 (emphasis in original). The government rejected the lowest bid as unreasonably low and awarded the contract to the plaintiff. After the low bidder protested, the Comptroller General recommended that the agency not exercise the option but instead reprocure the contract. The agency did so. The plaintiff sued, contending it had relied on the promises made at the pre-award bidders' conference and the government had breached the contract by failing to exercise the option. For its defense, the government relied on the plain language of the option clause in the contract and the disclaimer in the Solicitation Instructions that "Oral explanations or instructions given before the award of the contract will not be binding." Id. at 1301-02.

The court held that the government was equitably estopped from denying that the contract was renewed for the fiscal year. The government's reliance on the contractual and solicitation language was misplaced, as the context demonstrated it did not negate the representative's statements at the pre-award bidders' conference.

> It was the Government's intention, as well as the understanding of the plaintiff, that the successful bidder would be required to provide the personnel and supplies necessary to perform a contract extending over more than a 2-year period. . . . [The representative] was fully authorized to provide such information, and it is undisputed that plaintiff relied on it to its detriment. It was obvious that the successful bidder would have to incur a considerable amount of prepatory costs in order to start performance of the contract. . . . [I]t cannot be doubted that [the representative] intended for [plaintiff] to rely upon his statement.
>
> [. . . .]
>
> ["]To hold that the writing signed following such a conference . . . negates the oral agreement reached at the conference would be reckless of the reputation of the procurement system . . . . Meetings between Government procurement officers and prospective bidders would become a sham. Questions would be useless, for answers would be without force . . . . Respect for the answer is required by the respect given the Government's procurement process.["]

Id. at 1302-03 (quoting Sylvania Elec. Prods., Inc. v. U.S., 458 F.2d 994, 1008 (Ct. Cl. 1972).

2. **DOI Represented It Wanted More Advanced Capabilities.**

TKC Communications

DOI represented to TKC, both before and at the time of the issuance of the Task Order, that it needed the EMS Project and wanted its more advanced capabilities instead of those available through its existing e-mail applications. DOI is equitably estopped from refusing to exercise the option periods because TKC detrimentally relied on DOI's representations by spending over $15 million to purchase and provide the equipment to support the EMS Project.

**3. TKC Obtained and Provided Equipment in Reliance on DOI Representation.**

This point has been made previously. See pages 11-12, supra.

**4. DOI is Estopped from Refusing to Exercise the Options.**

DOI promised TKC that it would exercise all option periods. For whatever reason, it now refuses to live up to its promise. TKC incurred cost and provided DOI favorable pricing totally $17,547,786.30 in reliance on DOI's promise. In return, it has received only $4 million in lease payments, a notice of termination and its unopened equipment returned. DOI cannot be permitted to do business in this fashion. Based on its conduct and representations, DOI is estopped from refusing to exercise the remaining option periods.

## IV. CONCLUSION

The fact that DOI chooses to operate a balkanized[6] system of numerous, independent agencies is not TKC's fault. Because DOI's agencies could not agree on basic parameters for a united email system, the United States willfully failed to exercise the contractually mandated option periods. As a result, TKC now faces an enormous loss through no fault of its own. This outrageous conduct cannot be condoned.

DOI is in breach of the contract. It is difficult to image a more egregious breach. Further, DOI misrepresented its intent to pay TKC for the full lease term and is equitably estopped from refusing to exercise the option periods. Accordingly, DOI is liable to TKC for the full amount of the payments due under the remaining option periods, $13,547,786.30. The contracting officer should approve the claim in full.

Very truly yours,

Stephen M. James
President & CEO

[6] Webster's defines "balkanize" as "to break up into small, mutually hostile political units." Given DOI's behavior in this matter, the Balkans are a perfect metaphor for this agency. See Webster's New World Dictionary, Third College Edition, p. 105 (1989).

TKC Communications

## CERTIFICATION

Pursuant to FAR 33.207, I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

This the 25th day of January, 2007.

Stephen James
President & CEO

EXHIBIT A

**From:** Matthew_H_Stewart@nbc.gov
**Sent:** Sunday, October 02, 2005 12:08 PM
**To:** dmcmahon@hannonarmstrong.com
**Cc:** Priscilla_G_ElkShoulder@nbc.gov; jbutler@tkccommunications.com
**Subject:** Re: Essential Use (Virus checked)

Dan – Attached is the completed "essential use questionnaire" that we discussed on Friday evening. I have no issues with what is contained in the questionnaire below and will provide a copy for our Solicitors Office review on Monday, will sign as the program manager by 1:00 PM EDT.

**Matthew H. Stewart**
National Business Center
Department of the Interior
| Tel: 202-208-5769 | Mobile: 202-365-1075 | Fax: 202-208-1800 |

CONFIDENTIALITY NOTICE
This message (including any attachments) is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

"Dan McMahon" <dmcmahon@hannonarmstrong.com>

09/30/2005 05:26 PM

Please respond to <dmcmahon@hannonarmstrong.com>

To Matthew H Stewart/NBC/OS/DOI@DOI
cc
Subject Essential Use

Matthew,
Per our conversation, my contact info is below. Please send me the completed essential use questionaire when you've finished it.

Thank you.
Dan

Dan McMahon
Hannon Armstrong
1997 Annapolis Exchange Pkwy, Ste 520
Annapolis, MD 21401
Direct: (410) 571-6167
Fax: (410) 571-9894
www.hannonarmstrong.com

**NAME:** Matthew H. Stewart
**TITLE:** Program Manager and OCIO Representative
**DATE:** October 1, 2005
**RE:** EMS Messaging Services Project

**What essential government function does this department perform?**

With regards to the EMS project, the intent is to provide an Enterprise messaging (email) environment such that all Department of Interior bureaus and offices are migrated from a variety of legacy email environments (Lotus Notes, GroupWise, Exchange) to Exchange 2003.

The Department of Interior bureaus:
Manage 1 out of every 5 acres of land in the US.
Provide the resources for nearly one-third of the Nation's energy.
Works with 562 federally recognized Indian Tribes.
Administers US responsibility to four overseas Territories.
Provides water to 31 million citizens through 824 dams and reservoirs.
Receives over 450 million visits each year to 388 units of the National Park System, 544 wildlife refuges and vast areas of multiple use lands.
Provides opportunities for hunters and anglers, working to improve habitat on millions of acres of public and private lands.

**What essential function do the users of this product perform?**

Email (external and internal email distribution)

**What is the product being financed? How does the product enable the users to perform this essential function? Please be specific.**

Hardware and software to accomplish the email migration project. The HW/SW will be set up and the bureaus legacy mail environments will be converted to Exchange 2003. Once converted the end-users will be using Exchange 2003 to send and receive email.

**Is it replacement or new product? If a replacement, how long had the replaced product been in service?**

This is a replacement of existing email environments. The different bureaus and offices in DOI have been using Lotus Notes and GroupWise for approximately 9 years.

**Is all of the product that is being financed performing as expected, Is the Contractor performance fully satisfactory?**

The product has not been implemented yet. The migration project is expected to take up to 22 months to accomplish. At this point, the contractor is conducting Pre-Assessment activities and their performance is fully satisfactory.

**What, if any, are the performance requirements of the Contractor after acceptance?**

There will be specific Service Level Agreements attached to the operations and support of the new email environment. At this time those Service Level Agreements have not been finalized.

**Are there any investigations pending against the Contractor that could give rise to suspension or debarment?**

No.

**Has the government command using the product indicated whether the program will be curtailed or terminated?**

No.

**What is the Government's current plan with regard to the option years of the lease?**

The current plan is to have the individual bureaus and offices support the migration project. As they decommission their legacy environments, cost savings will be reaped to support the new environment. There is an operations and support component for the new system; however, it is not related to this lease. The lease is only for the hardware and software used to build the new messaging environment.

Matthew H. Stewart – DOI EMS PM

Date

# Exhibit B

The hardware and portions of the software purchased for EMS could readily be reutilized in any environment within DOI. There are several datacenters that could use a portion or all of the hardware resources procured through the lease.

The software BMC remedy is already utilized in the environment. The licenses and modules could easily be added to their existing service offering. Indeed, the DOI CTO council evaluated service management software and named BMC the department's preferred choice.

The legato software that deals with backup and restoration could be deployed in any area that requires backing up of system data in full or incremental pieces.

The Ironport appliances sit in front of a mailserver and provide spam and antivirus filtering if coupled with the Symantec software purchased as part of the lease. The software included anti-virus, brightmail spam filtering, and virus outbreak filters. These can all function either in a Microsoft exchange or lotus notes environment.

Egenera blade servers allow more processing power in less rack space. This simplifies cabling and reduces power consumption. According to a SearchWinSystems.com article on server technology, enterprises moving to blade servers can experience as much as an 85% reduction in cabling for blade installations over conventional 1U or tower servers. With so much less cabling, IT administrators can spend less time managing the infrastructure and more time ensuring high availability. The blade servers purchased for this project could be utilized any place within DOI that a server infrastructure is required.

Blade servers can connect to a storage pool facilitated by a network-attached storage (NAS), Fiber Channel, or iSCSI storage-area network (SAN). The advantage of blade servers comes not only from the consolidation benefits of housing several servers in a single chassis, but also from the consolidation of associated resources (like storage and networking equipment) into a smaller architecture that can be managed through a single interface.

A blade server is sometimes referred to as a *high-density server* and is typically used in a clustering of servers that are dedicated to a single task, such as:

- File sharing
- Web page serving and caching
- SSL encrypting of Web communication
- The transcoding of Web page content for smaller displays
- Streaming audio and video content

Like most clustering applications, blade servers can also be managed to include load balancing and failover capabilities.

Egenera systems are highly available, flexible platforms that eliminate the need to dedicate servers to applications. Instead, a datacenter virtualization architecture, which replaces physical components with software, can automatically repurpose and reallocate servers on demand. Virtualization means that servers can be easily shared, enabling enterprises to slash server count and reduce datacenter complexity by up to 80 percent.

EMC storage simplifies storage administration and adds flexibility since cables and storage devices do not have to be physically moved to move storage from one server to another. Note, though, that with the exception of SAN file systems and clustered computing, SAN storage is still a one-to-one relationship. That is, each device (or Logical Unit Number *(LUN)*) on the SAN is "owned" by a single computer (or *initiator*). In contrast, Network Attached Storage (NAS) allows many computers to access the same set of files over a network. It is now possible to combine the SAN and NAS using a NAS head. SANs tend to increase storage capacity utilization, since multiple servers can share the same growth reserve. The EMC storage equipment purchased for this project could be utilized any place where file storage is a requirement within DOI.