IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **TKC COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. ___________** |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **SERVE:** Michael B. Mukasey | ) | |
| U.S. Attorney General | ) | |
| U.S. Department of Justice | ) | |
| Office of the U.S. Attorney General | ) | |
| 950 Pennsylvania Avenue, N.W. | ) | |
| Washington, DC 20530-0001 | ) | |
| | ) | |
| **Defendant.** | ) | |

# EXHIBIT F

# TO COMPLAINT

**On Behalf of Plaintiff TKC COMMUNICATIONS, LLC**

United States Department of the Interior

OFFICE OF THE SECRETARY
NATIONAL BUSINESS CENTER
Washington, DC 20240

U.S. Department of the Interior
NBC
National Business Center

June 11, 2007

TKC Communications
Attn: Stephen James, President & CEO
11320 Random Hill Road, Suite 150
Fairfax, Virginia 22030

Subject: Certified Claim of TKC Communications Under Order No. 0405DO44761.

Dear Mr. James,

I have reviewed the claim of TKC Communications (TKC) submitted to the Department of the Interior on January 25, 2007. This letter constitutes the Department of the Interior (DOI) contracting officer's Final Decision with respect to that claim.

TKC asserts (1) that DOI is in breach of contract for not exercising additional option years under the Delivery Order, (2) that DOI misrepresented its intent to enter a lease to purchase, (3) that DOI is estopped from refusing to exercise the option periods, and (4) that TKC is entitled to $13,547,786.30.

For the reasons detailed below, I find that TKC is not entitled to any of the relief that it seeks under its claim of January 25, 2007, because the Government followed the "Lease Terms and Conditions" contained in the Order when it did not exercise the second option period.

I. BACKGROUND AND CHRONOLOGY

The following discussion provides factual background, mostly chronologically, presented within particular sub-headings, relevant to my consideration of TKC's claim.

A. <u>Overview: The Enterprise Messaging System (EMS), Investment Review Board (IRB), and Requirement and Funding Issues</u>

DOI Environment and Governance Structure

The Department of the Interior is an organization comprised of thirteen Bureaus and

Offices (the bureaus). Each bureau operates its own email system. As a result of this decentralized approach to email, at least three different email products are in use across the bureaus.

DOI has a established a governance structure for managing its portfolio of IT investments that is consistent with the Office of Management and Budget (OMB) Circular A-130. This governance structure consists of the following committees:

- The E-Government Team consists of one member from each bureau. Members come from program areas and bring the perspective of business drivers for IT investments.
- The Information Technology Management Council (ITMC) consists of the Chief Information Officer (CIO) from each bureau. The central focus of the ITMC is to assure development and operation of integrated systems that help DOI and its bureaus to fulfill their mission objectives.
- The Investment Review board (IRB) is comprised of the E-Government Team and the ITMC. As defined in its charter, the IRB has authority to "review and approve/disapprove all Departmental or bureau cross-cutting system IT investment proposals greater than $5 Million total life cycle".

Identification of Need

In June 2002, SAIC completed an Information Technology Management Reform (ITMR) study for DOI. This study assessed the current state of DOI's IT environment and identified a number of operational areas with the potential to yield benefits from consolidation and standardization of technology platforms.

One of the areas identified in the ITMR study was email and messaging services. A high-level assessment performed by SAIC indicated that standardization on a single email product had the potential to deliver significant cost savings to DOI.

As a result of the recommendation contained in the ITMR study, an initiative to consolidate electronic mail services within DOI was initiated by the ITMC.

Planning and Analysis

During Fiscal Years 2003 – 2004, a working team chartered by the ITMC developed requirements and a Statement of Objectives (SOO) for an Enterprise Messaging Service (EMS). The activities of this working team were reported to the ITMC on a regular basis.

In August 2004, a project charter for the implementation of EMS was approved by the ITMC. This charter defined EMS as a single departmental messaging service based on Microsoft (MS) Exchange, operated within a DOI enterprise management and operations control structure.

EMS Funding and Procurement

During the course of FY2005, DOI reviewed technical proposals for the implementation of EMS that had been submitted by multiple vendors, including TKC. An evaluation team comprised of bureau technical representatives and the DOI Chief Technology Officer (CTO) was assembled to assess the proposals. TKC's proposal was determined to be the strongest technical proposal. This assessment was based in part on the specification of Dell servers as part of the solution.

In June 2005, the IRB approved FY2007 funding for EMS in the amount of $15M.

In July 2005, DOI held negotiations with TKC. They discussed using GovWorks IDIQ Contract No. 73132, removing Level 1 from the Help Desk and clarifying roles and responsibilities, taking office furniture out of the lease, labor rates and discounts, SBA approval for the subcontracting plan, lease terms and conditions, payment schedule, delivery terms, acceptance and property management personnel, and contractor access to the building and computer system. DOI received the revised cost proposal from TKC. There were still some items in the revised proposal that needed to be changed and/or negotiated.

In August 2005, DOI issued a Pre-Assessment Task Order to TKC. This task order authorized a pre-assessment phase, as described in TKC's technical proposal submitted to DOI on August 11, 2005. This task order was for services only. The expectation was that during this task TKC would complete the analysis required to determine the exact technical solution that was required to meet DOI's needs, including the hardware and software components that would be required to build EMS and support the ongoing operations of the system. The "kick-off" meeting to initiate this task was conducted on August 23, 2005.

Also in August 2005, TKC began to pressure DOI to execute a lease agreement for hardware and software to support EMS, even though pre-assessment activities as proposed by TKC had not yet been initiated. In fact, on August 25, 2005, just two days after the pre-assessment kick-off meeting, Paul Kwiatkowski of TKC informed DOI that significant savings would be lost unless the equipment lease was awarded by September 15, 2005. It is unknown how TKC could have accurately specified the hardware and software required to support EMS before initiating pre-assessment activities.

On September 15, 2005, the Delivery Order was signed by the Contracting Officer and the first option year of the lease initiated. Subsequent to the signing of this lease, DOI was made aware that the Dell servers originally specified by TKC and evaluated by DOI's review team had been replaced by equipment from a vendor called Egenera. The Egenera products are not considered to be an approved technology for DOI. Ultimately, the leased equipment, including the Egenera servers, were accepted by DOI.

Pre-Assessment Activities

During the course of FY2006, efforts under the pre-assessment task order with TKC continued. Unfortunately, these efforts were hampered by repeated restating of requirements, technical modifications from the vendor and a lack of follow through on verbal commitments from TKC to the DOI CIO regarding the implementation of a tapeless backup and archive system. During this period DOI and TKC were unable to reach agreement as to what requirements were defined in the SOO. As a result, DOI was unable to determine whether TKC's proposals fully addressed DOI's needs.

Ongoing ITMC and IRB Oversight

In parallel with the pre-assessment activities defined above, the ITMC and IRB were regularly briefed on the status of the EMS initiative, including the various cost proposals and issues regarding requirements. Collectively the ITMC expressed concerns over the direction that the project was going and the cost impacts on DOI's IT budget.

Finally, on September 28, 2006, a meeting of the DOI IRB was held to discuss the status of the EMS initiative. During this meeting the IRB members expressed continued concern over the costs and schedule associated with EMS. In response to these concerns, the IRB exercised their authority and voted to no longer pursue the implementation of a single electronic mail system for DOI.

This decision eliminated the funding source for the EMS project. This decision also eliminated the requirement for a DOI-wide EMS and for any equipment or services associated with the implementation of EMS, including the computer equipment that had been acquired under the lease agreement with TKC.

Instead of implementing a single DOI email system, the IRB decided that bureaus would migrate from their existing legacy electronic mail environments to Microsoft Exchange on a bureau-by-bureau basis. Individual bureau migrations would occur based upon the availability of bureau funding and other resources required to complete the transition.

B. <u>Relevant Contract Language</u>

TKC cites to the "Statement of Government Intent" on page 9 of what it refers to as the "Task Order."[1] However, certain language not cited by TKC is also relevant to the contracting officer's consideration of numerous key allegations upon which TKC bases its claim, as well as its characterization of DOI's conduct.

The following language appears on page 3 (of 19) of the Order:

---

[1] We believe this may more accurately be termed a "delivery order." This is indicated by the "DO" in the number 0405DO44761, the fact that "DELIVERY" is checked under Box 8, "Type of Order," by the use of the term throughout the text of the Order, and because there is only incidental provision of support services related to the equipment and software purchased.

> The equipment and quantities may be subject to change based on the end results of the Pre-assessment. The Government may need to negotiate and modify this delivery order based on the findings of the Pre-assessment.

The "STATEMENT OF GOVERNMENT INTENT" language at page 9 of the Order follows in its entirety:

> (a) The Government and the Contractor understand that a delivery order issued pursuant to this SIN is a lease arrangement and contemplates the use of the product for the term of the lease specified in such delivery order (the "Lease Term"). In that regard, the Ordering Agency, as lessee, understands that the lease provisions contained herein and the rate established for the delivery order are premised on the Ordering Agency's intent to fulfill that agreement, including acquiring products for the period of time specified in the order. Each lease hereunder shall be initiated by a delivery order which shall, either through a statement of work or other attachment, specify the product being leased, and the required terms of the transaction.
>
> (b) Each ordering office placing a delivery order under the terms of this option intends to exercise each renewal option and to extend the lease until completion of the Lease Term *so long as the need of the ordering office for the product or functionally similar product continues to exist and funds are appropriated.* Contractor may request information from the ordering office concerning the essential use of the products.

(Emphasis added)

Under "LEASE TERM," at page 10, additional relevant language is as follows:

> (a) The date on which the ordering office accepts the products is the Commencement Date of the lease. *For acceptance to occur, the products must operate in accordance with the product's published specifications and statement of work. Acceptance shall be in accordance with the terms of the contract* or as otherwise negotiated by the ordering office and the Contractor.
>
> (b) Any lease is executed by the Ordering Office on the basis that the known requirement for such product exceeds the initial base period of the delivery order, which is typically 12 months, or for the remainder of the fiscal year. Pursuant to FAR 32.703-3(b), delivery orders with options to renew that are funded by annual (fiscal year) appropriations may provide for initial base periods and option periods that cross fiscal years so long as the initial base period or each option period does not exceed a 12 month period. * * *

(c) The total Lease Term will be specified in each delivery order, including any relevant renewal options of the Government. All delivery orders, whether for the initial base period or renewal period, shall remain in effect through September 30 of the fiscal year (unless extended by statute), through any earlier expiration date specified in the delivery order, or until the Government exercises its rights hereunder to acquire title to the product prior to such expiration date. *The ordering office, at its discretion, may exercise each option to extend the term of the lease through the lease term.* Renewal delivery orders shall not be issued for less than all of the product and/or software set forth in the original delivery order. *Delivery orders under this SIN shall not be deemed to obligate succeeding fiscal year funds.* The ordering office shall provide the Contractor with written notice of exercise of each renewal option as soon as practicable. Notice requirements may be negotiated on an order-by-order basis.

(d) Where an ordering office's specific appropriation or procurement authority provides for contracting beyond the fiscal year period, the ordering office may place a delivery order for a period up to the expiration of the Lease Term, or to the expiration of the period of availability of the multi-year appropriation, or whatever is appropriate under the applicable circumstance.

(Emphasis added)

Under the placeholder for "LEASE TERMINATION," at page 10, it states "Deleted."

Under "LEASE END/DISCONTINUANCE OPTIONS," at pages 11-12, the Order states:

(a) Upon the expiration of the Lease Term, *of if the government doesn't exercise an option period hereunder, the Government will return the Product to the Contractor unless* the Government by 30 days written notice elects either:

(i) to purchase the product for the residual value of the product, or
(ii) to extend the term of the Lease, as mutually agreed. * * *

* * *

(c) Returns:

(i) Within fourteen (14) days after the date of expiration of the lease term or option period, the Government shall, at its own risk and expense, have the products packed for shipment in accordance with manufacturer's specifications and return the products to Contractor at the location specified by Contractor in the continental US, in the same condition as when delivered, ordinary wear and tear excepted. * * *

(Emphasis added)

Under "TITLE," at page 12, the Order provides that:

> During the lease term, product shall always remain the property of the Contractor. The Government shall have no property right or interest in the product except as provided in this leasing agreement and shall hold the product subject and subordinate to the rights of the Contractor. * * *

Under "Period of Performance," at pages12-13, the Order provides that:

> The period of performance for this effort consists of a base period from September 15, 2005 through September 30, 2005 and three 12 month option periods. The dates are listed in the table below:

| | | |
|---|---|---|
| Base Period | 9/15/2005-9/30/2005 | $0.00 |
| Option Period 1 | 10/1/2005-9/30/2006 | $4,000,000 |
| Option Period 2 | 10/1/2006-9/30/2007 | $6,000,000 |
| Option Period 3 | 10/1/2007-9/30/2008 | $7,547,786.30 |

Under "LEASE PAYMENT SCHEDULE," on pages 13-14, the total "Purchase Price" is stated to be $15,417,088. The total scheduled lease payments are $17,547,786.30.

At page 19, the Order contains "Contract Clauses." The first, 52.217-09, OPTION TO EXTEND THE TERM OF THE CONTRACT (MARCH 2000), provides that:

> The Government may extend the term of this contract by written notice to the Contractor within 5 days for Option Period 1 and 30 days for all other options . . . provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 7 days for Option Period 1 and 60 days for all other options . . . before the contract expires . . .

It also contained 52.232-18, AVAILABILITY OF FUNDS (APRIL 1984), which provides that:

> Funds are not presently available for this contract. The Government's obligation under this contract is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. *No legal liability on the part of the Government for any payment may arise until funds are made available to the Contracting Officer for this contract* and until the Contractor receives notice of such availability, to be confirmed in writing by the Contracting Officer.

(Emphasis added)

It also contained 52.232-19, AVAILABILITY OF FUNDS FOR THE NEXT FISCAL

YEAR (APRIL 1984), which provides that:

> Funds are not presently available for performance under this contract beyond 9/30/2005. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. *No legal liability on the part of the Government for any payment may arise for performance under this contract beyond 9/30/2005, until funds are made available to the Contracting Officer for performance* and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

(Emphasis added)

Under the Order, DOI timely made all payments for Option Period 1, totaling $4,000,000, which was divided into payments of $1,000,000 each, to be made in December 2005, March 2006, June 2006, and September 2006. The amount of TKC's claim, $13,547,786.30, reflects the total scheduled lease payments of $17,547,786.30 minus the $4,000,000 that DOI paid under Option Period 1.

C. Additional Relevant Facts

The following supplements the background and chronology relevant to the EMS project, the Delivery Order, and my consideration of TKC's claim. It also restates and expands upon some facts from heading "A" (Overview: EMS, IRB and Requirement and Funding Issues), above.

| Date | Event |
|---|---|
| October 2004 | DOI issues EMS solicitation. |
| 11/8/04 | TKC provides EMS proposal. |
| January 2005 | DOI evaluation panel rates TKC's proposal the highest technically and evaluates TKC's price as $51,955,299. |
| 6/28/05 | TKC provides revised proposal. |
| August 2005 | TKC pressures DOI to execute a lease agreement for hardware and software to support EMS, even though pre-assessment activities have not yet been initiated. |
| | DOI contracting officer provides lease language in draft Delivery Order No. 0405DO044761 to Solicitor's Office for review. Solicitor's Office finds proposed lease termination language legally insufficient. |

| | |
|---|---|
| 8/11/05 | TKC proposal for pre-assessment submitted to DOI. |
| 8/11/05 | Contracting officer requests that TKC remove the lease termination language from TKC lease proposal. |
| 8/19/05 | DOI issues Order No. 0405TO44380, not-to-exceed $976,771, to TKC for "Time and Materials Task Order for Preliminary Assessment Activities in support of the DOI Enterprise Messaging Services Project in accordance with the Statement of Objectives and Contract No. 1435-04-04-CT-73132." See Order at page 3. Period of performance is 14 weeks from date of award. |
| 8/23/05 | Pre-assessment "kick off" meeting is held. |
| 8/25/05 | Paul Kwiatkowski of TKC informs DOI that significant savings will be lost unless the equipment lease is awarded by September 15, 2005. |
| 8/31/05 | DOI contracting officer and TKC meet to discuss lease termination language. |
| 9/14/05 | TKC contacts DOI CIO by email, advising that significant savings on equipment will expire if lease not signed. |
| 9/15/05 | DOI signs Order No. 0405DO044761, which includes Egenera blade servers. |
| 9/29/05 | DOI CTO expresses concerns about Egenera blade servers because TKC had proposed Dell servers. |
| October 2005 | DOI CTO advises DOI Enterprise Infrastructure Division Chief and others that Egenera is not approved for DOI use within the protocols of DOI's Technical Reference Model (TRM). |
| | EMS users note that software required for Blackberry access is not included in TKC's EMS solution. TKC offers to develop support strategy. |
| | Issues also arise regarding implementation of Exchange Journaling functionality with Zantaz; TKC informs DOI that this beyond the scope of its 11/04 proposal. |
| November 2005 | BIA identifies numerous concerns about the EMS' (per TKC's proposed solution) apparent inability to support BIA (and related agency) Trust functions, including interfacing with Zantaz, providing back-up and disaster recovery, converting legacy system emails, |

| | |
|---|---|
| | conformance with hardware standards and security requirements, and additional costs for these capabilities. Bureau of Reclamation also enumerates concerns with EMS. |
| 11/28-12/1/05 | CIO staff attends second EMS Summit Meeting in Denver. BIA estimates additional costs of meeting Trust requirements at over $ 5 million. |
| January 2006 | Contracting officer issues third version of update/amendment to EMS Statement of Objectives (SOO). Requests that TKC address the following objectives: Build out of the MS Exchange Trust Organization's EMS environment in Denver; Build out of MS Exchange Non-Trust Organizations in Reston; Build out and support DOI Electronic Email Archive System; Build out and support DOI Blackberry server environment; Build out Trust EMS Disaster Recovery environment in Reston; Migrate Trust and Non-Trust Users to Exchange 2005 and provide operations and support to the users migrated. |
| February 2006 | TKC submits revised estimate significantly increasing costs for five-year solution (2/1/06). |
| | DOI EMS Project Manager expresses concerns with proposal, such as 2.6 years versus 5 years of service and hardware and software does not support all objectives. Cost for full coverage is approximately $70 million. Recommends data call to affected DOI bureaus to update their cost assumptions. |
| 2/27/06 | DOI sends 102 clarification questions to TKC. TKC responds on 3/2/06. |
| March 2006 | High-level meetings, including an Office of Budget representative, to discuss status of proposal; determine that it is too expensive. |
| 3/31/06 | DOI CIO, DOI contracting, and Solicitor's Office meet with TKC; advise of intention to complete EMS in-house and, accordingly, no DOI no longer needs equipment. |
| April 2006 | Microsoft confirms that Egenera is not Premier supported by Microsoft. |
| | TKC indicates willingness to work with DOI on swapping out unacceptable hardware. |
| May 2006 | Microsoft re-confirms that Egenera servers are not supported by Microsoft on its "Hardware Compatibility" list. |

| | |
|---|---|
| | Meeting with DOI, TKC, Egenera and Accenture (5/31/06) |
| June 2006 | Meeting with DOI, TKC, Microsoft and Egenera (6/2).<br><br>Microsoft confirms that TKC's cluster solution does not current qualify as a Microsoft-supported cluster solution (6/12).<br><br>IRB passes a motion to have the OCIO update costs and provide a business case for the EMS. |
| 7/31/06 | TKC advises that the clustered solution is Microsoft certified. |
| August 2006 | Contracting officer sends TKC a request for its proposal to the revised EMS SOO (8/23/06) |
| 8/29/06 | Office of Budget expresses concern about sufficient funding for upcoming lease option year. |
| 8/30/06 | Meeting with Deputy Assistant Secretary, CIO, Chief Budget Officer, and others regarding level of funding for EMS and other high-priority IT initiatives. |
| 9/07/06 | Contracting officer asks OCIO about status of funding for upcoming lease option year. Funding documents must be received by 9/18/06. |
| 9/20/06 | EMS technical panel evaluation TKC proposal is advised to perform "no further work" due to funding considerations |
| 9/28/06 | IRB meets to discuss the EMS project; decides not to continue funding EMS. |
| 9/29/06 | Contracting officer advises TKC, through two separate letters, that:<br><br>(a) RFP 1406-04-06-RP-45469 is cancelled "due to discontinuance of the DOI EMS requirement" and DOI's inability to "obtain sufficient appropriations to fund this project" and<br><br>(b) DOI's intention not to exercise the second option year of the lease, "effective 10/1/2006" under Order No. 0405DO44761 "due to lack of funds and no continuing need for the leased equipment." The contracting officer concludes by citing the Order, Paragraph 7, and noting that the "Government intends to return the leased equipment to TKCC within 14 days of not exercising the option. Accordingly, please provide an address to which to ship the |

| | |
|---|---|
| | equipment." |
| 10/11/06 | DOI requested a shipping address from TKC to which to send the equipment; informs TKC that the 14-day period for shipping the equipment begins when TKC provides this information. |
| 11/16/06 | TKC provides shipment price quote in the amount of $8,850. |
| 11/20/06 | TKC revises the quote to include insurance in the amount of $26,500, for a total of $35,350. |
| 12/12/06 | Purchase Order No. 0407-PO66864 was issued to TKC for equipment shipment. |
| 1/11/07 | TKC retrieves equipment from DOI locations. |

## II. DISCUSSION

At the time that TKC was awarded Delivery Order No. 0405-DO44761 off the IDIQ Contract No. INM0404CT73132, DOI intended to establish an Enterprise Messaging System (EMS). The Order was for the purpose of supporting the EMS requirement. It is clear, however, the EMS requirements—and TKC's approach to meet them—were not definitized when DOI signed the Order. The parties understood this, which is why the Order stated, on page three, that it could "change based on the end results of the Pre-assessment" and that DOI might "need to negotiate and modify the delivery order based on the findings of the Pre-assessment."

Unfortunately, the EMS—or at least TKC's ability to meet DOI's EMS needs within an agreed or understood budget—never quite was definitized. In this regard, TKC's use of Egenera blade servers, which evidently differed from what TKC had proposed in November 2004, only further served to delay and complicate DOI-wide buy-off of TKC's solution. Then, even as possible definitization finally seemed within grasp (almost two years after TKC initially had proposed its solution), the new cost of the EMS—again, a DOI-wide solution requiring widespread DOI bureau and office buy-in—outstripped prior budgetary planning and projections. Ultimately, between the complications (some self-induced by TKC), delays, cost escalations, and problems—problems that TKC fully understood—with definitization, the IRB decided no longer to support the EMS solution. The fact that $4 million had already been spent on equipment that was never used, and that another $6 million had to be committed immediately for the same equipment—all of which was committed to a piecemeal EMS approach that, in the best case, exceeded available DOI budgets—only further drove the IRB's decision.[2]

---

2 It is also important to note that, upon the IRB's decision not to implement the EMS project, an effort was made by DOI to repurpose the leased equipment by offering it to its bureaus and other federal agencies. Unfortunately, there was no interest in the leased equipment.

By referring to the pre-assessment—which, in turn, related to the not-yet-definitized EMS requirement—the Order referred to external events and transactions. The pre-assessment effort was not insignificant. It involved expenditure of nearly $1 million over an almost four-month effort. It had not begun in earnest when DOI signed the Delivery Order. It is also clear that TKC pressured DOI to enter the lease agreement before completion of the pre-assessment activities that were to define the system requirements and specification of hardware and software needed to meet those requirements.

Under these circumstances, my predecessors properly acted to protect DOI's interests; that is, the final Order language was the product of negotiations in which TKC initially would have shifted much greater risk of uncertainty onto DOI. My predecessors did not stand for that and the Order ultimately contained language appropriately protecting the Government from making an antideficient commitment, while at the same time significantly protecting TKC by not permitting DOI simply to cancel the lease *if* it still were going to obtain the "same product or functionally similar" equipment or software *and* funding was still available. *See* Order at 9.

TKC asserts that DOI was "restricted [in] its right not to exercise the option periods by agreeing that it would exercise each option period (a) so long as it had a need for the equipment or functionally similar equipment, and (b) funds were appropriated." *See* Claim at 6. TKC overstates the degree to which DOI was restricted. Rather, as noted, the "Statement of Government Intent," at page 9, made it clear that DOI only "intends to exercise each renewal option and to extend the lease . . . so long as the need of the ordering office for the product or functionally similar product continues to exist *and* funds are appropriated." Certainly, on September 28, 2006, both conditions no longer applied.

Continuation of the Lease was also expressly subject to the availability of funds. Lease at 19. Both "Availability of Funds" clauses (52.232-18 and 52.232-19) specify that the Government has no legal liability "until funds are made *available to the Contracting Officer*," who also must first have "receive[d] notice of availability." Here, this contracting officer was only one among many people awaiting the decision of upper-level managers and, ultimately, the duly constituted final authority, the IRB, to decide whether the EMS—which had long been running into delay and difficulty—would or would not move forward.

Accordingly, I was not only well within DOI's contractual rights, but I was *required* as a contracting officer, not to exercise the second option period under the Delivery Order.

In this regard, our Solicitor's Office advises us that there are decisions indicating that TKC's asserted right of recovery is doubtful at best. And, as noted, this is also an instance in which TKC's own actions have certainly been a contributing factor to—if not

a primary factor in—the conditions bringing about this situation.[3]

In *Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222 (1990), the U.S. Claims Court (now U.S. Court of Federal Claims) found that the Government was not liable for various damages when it did not renew an equipment lease due to lack of funding. The court did not accept Uniq's argument that the Government had "induced" it to offer a lower monthly lease rate based upon a promise that it would exercise all option periods. 20 Cl.Ct. at 233.[4] Among other things, the court looked at the lease which—like the TKC lease—explicitly recognized separately-priced base and option periods. *Id.* at 234. The court could find "no basis in law for the plaintiff's belief that it was bidding on, or had received, a 62-month contract." *Id.* The court found it significant that the lease contained an "Availability of Funds" clause—which "deprives Uniq of any and all recourse for additional compensation in the event of non-renewal" and is a "limitation on the government's liability . . . . [which] shields the government from liability when it fails to secure funding." *Id.* at 235.

Similarly, in *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327 (1999), the U.S. Court of Federal Claims considered whether the Government remained liable following its non-renewal under a lease-to-ownership-plan (LTOP) for acquiring a computer system. *See Cray Research*, 41 Fed. Cl. 427, 429 (1998). First, the court found that the rule of *contra proferentem—i.e.*, that any ambiguity in a contract is construed against the drafter of the language—did not apply because the parties had negotiated certain terms. 44 Fed. Cl. at 330. *See* TKC Lease, at 9-10. The court then found, even more fundamentally, that unless agencies have specific, multi-year contracting authority or are operating under a no-year appropriation, the Antideficiency Act "prohibits contracts purporting to bind the government beyond one year." 44 Fed. Cl. at 332. Unless a "multi-year contract is subject to the government's renewal option each year, it violates the Antideficiency Act." *Id.* citing *Leiter v. United States*, 271 U.S. 204 (1926)(multi-year Government lease creates no binding obligation against the Government after the first year). With this background, the court found Cray's argument that the LTOP contract "obligates the [Government] to make payments for all five years of the contract, so long as Congress appropriates funds each year" to be unsupported. *Id.* at 333.

The claim that TKC provided favorable pricing in reliance on DOI representations (*see* Claim at 11-12) is also without merit. TKC was aware of and offered separate price proposals for Option Periods 1 through 3. In any case, there is no basis for TKC to believe it was contracting for the entire possible duration of the option periods (36

---

[3] The fact that TKC pressured DOI to sign the Delivery Order, even before the EMS pre-assessment had even begun, only makes TKC's position less sympathetic. And switching from Dell to Egenera servers in the equipment lease, as distinct from TKC's proposed solution, also did not help matters. But these facts are not necessary to my conclusion that TKC's claim is unfounded. The Delivery Order language, the IRB's cancellation of the EMS, and the attendant lack of funding both for the EMS and the next option period fully support my conclusion.

[4] *Compare James Hovanec*, PSBCA No. 4767, 2004-2 BCA ¶ 32,805, Nov. 16, 2004 (Board cannot find government bad faith in failing to exercise lease renewal option; contractor must show "clear and convincing evidence of some specific intent to harm him").

months). *See Uniq supra.* To the extent that Mr. Stewart provided documentation indicating that DOI had an ongoing need for the equipment, this much more reflected DOI's commitment at that time to an EMS solution (and, it is noteworthy that he provided this in October 2005, which was *after* DOI signed the Delivery Order) than to the specific equipment and software TKC was providing. Clearly this is so because, as noted the Delivery Order, the parties specifically acknowledged the yet-uncompleted pre-assessment work and that the Order was "subject to change" based upon the "end results of the Pre-assessment." That everyone—Government and TKC alike—had best hopes—hopes that, for a number of reasons, were not realized—is quite different than charging DOI with some kind of inducement. This would be a difficult burden for TKC in any case. For DOI to be "estopped" from not exercising the options (*see* Claim at 12-14), TKC would have to show that, among other things, it was totally ignorant of the funding and performance risks associated with the Delivery Order, the pre-assessment, and the lack of definitization (which certainly had not occurred on September 15, 2005) of the EMS requirement. *EFG Associates, Inc.*, ASBCA No. 50342, 99-2 BCA ¶ 30,525. On its face, the Delivery Order acknowledged those risks. There is no evidence that the contracting officer "promised or otherwise guaranteed" that DOI would fund work beyond any particular point in the life of the lease, nor did the contracting officer "ratify any such representations made by others." *EFG Associates.*

Finally, in another case where a contractor sued for breach of contract, the court held "that language in government procurement contract, providing that Government's obligations under contract and under renewals thereof were contingent upon continued availability of funds, was a limitation on Government's liability and did not obligate Government to exercise renewal rights," even if sufficient funds were available. *Government Systems Advisors, Inc., v. United States.*, 847 F.2d 811 (Fed. Cir. 1988). Specifically, where an option clause is nearly identical, *id* at 812, to the clause in the present case, 52.217-09, *Option To Extend The Term Of The Contract*, the interpretation should also be comparable. That is, the clause plainly states that the Government may extend the term of the contract. That this is a true option is illustrated by the phrase, "*if* the Government exercises this option..." *Id* at 813. This recognizes that the exercise of the option was not a foregone conclusion. Along these same lines "LEASE END/DISCONTINUANCE OPTIONS," at pages 11-12 of the TKC Delivery Order also contemplated that "*if the government doesn't exercise an option period* hereunder" it would take certain steps—which all were properly taken here—to return the leased equipment to the contractor.

III. CONCLUSION

For all of the foregoing reasons, I find that TKC's claim is without merit and is hereby denied. This is the final decision of the Contracting Officer. You may appeal this decision to the Civilian Board of Contract Appeals (1800 F Street, N.W., Washington, D.C. 20405). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision,

and identify the contract by number. With regard to appeals to the board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. § 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Respectfully,

Jehad Salameh
Contracting Officer
Acquisition Division III